UNITED STATES DISTRICT COURT
THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-10780-GAO

SMITH VIL,
Plaintiff,

v.

PRICE WATERHOUSECOOPEERS LLP, CHRISTINE LENNON, SARAH MCENEANEY,
and MANDY LAU,
Defendants.

**ORDER ADOPTING REPORT AND RECOMMENDATION**
August 2, 2012

O'TOOLE, D.J.

After review of the relevant pleadings and submissions, including the objection of PricewaterhouseCoopers LLP ("PwC") (dkt. no. 23), I ADOPT the Report and Recommendation of the magistrate judge. While it is true that the 2008 charge filed by the plaintiff with the EEOC did not specifically mention racial discrimination as a basis for the complaint about the manager's condescending attitude toward the plaintiff, in the context of the entire statement written by the plaintiff in the charge, it is fairly inferable that his complaint in that respect was, as it was with respect to prior incidents, that he was being treated differently because of his race. Similarly, the language of the 2009 charge should be understood against the background of the plaintiff's prior complaints of racial discrimination.

PwC's motion to dismiss is DENIED for the reasons set forth in the Report. The motion to dismiss by the individual defendants is GRANTED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SMITH VIL,
      Plaintiff,

      v.                                    CIVIL ACTION NO.
                                            11-10780-GAO

PRICEWATERHOUSECOOPERS LLP,
CHRISTINE LENNON, SARAH
McENEANEY and MANDY LAU,
      Defendants.


## REPORT AND RECOMMENDATION RE:
## DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT
## (DOCKET ENTRY # 5)

### June 22, 2012

**BOWLER, U.S.M.J.**

Pending before this court is a motion to dismiss the amended complaint filed by defendants PricewaterhouseCoopers LLP ("PwC"), Christine Lennon ("Lennon"), Sarah McEneaney ("McEneaney") and Mandy Lau ("Lau"). (Docket Entry # 5). PwC, Lennon, McEneaney and Lau (collectively: "defendants") move to dismiss under Rule 12(b)(6), Fed. R. Civ. P. ("Rule 12(b)(6)"), for failure to state a claim upon which relief may be granted. Plaintiff Smith Vil ("plaintiff") contends the complaint contains allegations sufficient to state a claim for relief. (Docket Entry # 15, p. 1). After conducting a hearing on March 8, 2012, this court took the motion to dismiss (Docket Entry # 5) under advisement.

The parties' dispute arises out of plaintiff's employment with PwC.  The two count amended complaint sets out the following causes of action:  (1) racial discrimination in violation of 42 U.S.C. § 2000-e ("Title VII") and Massachusetts General Laws chapter 151B ("chapter 151B") (Count One); and (2) retaliation in violation of Title VII and chapter 151B (Count Two).  (Docket Entry # 3).  The motion seeks to dismiss both counts.  (Docket Entry # 5).

Defendants argue that Count One is subject to dismissal because according to plaintiff he did not receive his poor evaluation due to unlawful discriminatory animus but rather from complaining about his manager's condescending attitude.  (Docket Entry # 6, p. 7).  Defendants submit that Count Two is subject to dismissal because plaintiff fails to show that the alleged retaliation resulted from plaintiff's complaint of racial discrimination.  (Docket Entry # 6, p. 8).  Additionally, defendants argue that the 300 day limitations period of Title VII and chapter 151b bars plaintiff's allegations of earlier race discrimination.  (Docket Entry # 6, pp. 9-10).  Individual defendants, Lennon, McEneaney and Lau, also assert that the Title VII claims must be dismissed because PwC is plaintiff's statutory employer and the court already dismissed the same claims with prejudice.  (Docket Entry # 6, p. 11).

Plaintiff maintains he sufficiently pled racial discrimination because the harm alleged can be associated to his allegations of mistreatment based on his race. (Docket Entry # 15, pp. 3-4). Additionally, plaintiff argues that the reasonable relation doctrine and the scope of investigation doctrine provide a means to avoid dismissal even if he failed to sufficiently allege racial discrimination in his May 2008 charge ("administrative charge") to the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission Against Discrimination ("MCAD"). (Docket Entry # 15, pp. 4-5). Plaintiff, however, does not oppose the dismissal of claims against Lennon, McEneaney and Lau. (Docket Entry # 15, p. 1). Accordingly, only the Title VII and chapter 151B discrimination and retaliation claims against PwC remain in this action.

## STANDARD OF REVIEW

The standard of review for a Rule 12(b)(6) motion is well established. To survive a motion to dismiss, the complaint must include factual allegations that when taken as true demonstrate a plausible claim for relief even if proof of the facts is improbable. Bell Atlantic, Corp. v. Twombly, 550 U.S. 544, 555-558 (2007). Although "not equivalent to a probability requirement, the plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully." Boroian v. Mueller, 616 F.3d 60, 65 (1st Cir. 2010) (internal quotation

3

marks omitted). "[A]ccepting as true all well-pleaded facts in the complaint and making all reasonable inferences in the plaintiff's favor," Id. at 64, the "factual allegations 'must be enough to raise a right to relief above the speculative level.'" Gorelik v. Costin, 605 F.3d 118, 121 (1st Cir. 2010).

In considering the merits of a motion to dismiss, the court's review is limited "to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken." Urman v. Novelos Therapeutics, Inc., 796 F.Supp.2d 277, 281 (D.Mass. 2011); accord Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55-56 (1st Cir. 2012) (court can consider "implications from documents attached to or fairly incorporated into the complaint . . . facts susceptible to judicial notice, and concessions in plaintiff's response to the motion to dismiss") (internal quotations and footnotes omitted). In certain circumstances a court may also "consider 'documents the authenticity of which are not disputed by the parties'" as well as "'documents central to plaintiffs' claim.'" Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007). Plaintiff references the administrative charge in the complaint (Docket Entry # 3, ¶ 55) and it is therefore proper to consider both the complaint and the administrative charge in reviewing the motion to dismiss.[1]

<hr />

[1] Plaintiff also filed a 2009 administrative charge. (Docket Entry # 18, Ex. A). The claims in the 2009 charge were consolidated with those of the 2008 charge and the 2009 charge

Drawing reasonable inferences in plaintiff's favor but eschewing reliance on "'bald assertions, . . . unsubstantiated conclusions,'" Fantini v. Salem State College, 557 F.3d 22, 26 (1st Cir. 2009), and legal conclusions, see Dixon v. Shamrock Financial Corp., 522 F.3d 76, 79 (1st Cir. 2008) (rejecting "'unsupported conclusions or interpretations of law'" in reviewing Rule 12(b)(6) dismissal), the complaint and administrative charge set out the following facts.

## FACTUAL BACKGROUND

Plaintiff, a person of color self-identified as black, was born in Haiti and is of African ancestry. (Docket Entry # 3, ¶¶ 1, 60). From June 2004 through January 24, 2011, plaintiff worked at PwC, an international network of firms. (Docket Entry # 3, ¶¶ 2, 8). Plaintiff worked in PwC's Boston office first as an audit associate and later as a senior audit associate in PwC's Assurance Line. (Docket Entry # 3, ¶¶ 8-9).

On March 3, 2005, plaintiff emailed Christopher Devine ("Devine"), his then Manager Counselor, regarding plaintiff's concerns about treatment he received from colleagues and attributing the treatment to his race. (Docket Entry # 3, ¶ 13). Subsequently, plaintiff unsuccessfully attempted to schedule a

---

was dismissed. (Docket Entry # 6, p. 4). It is therefore proper to consider the 2009 administrative charge because the document is central to plaintiff's claims. See Curran v. Cousins, 509 F.3d at 44.

meeting with Devine who was unavailable to provide direct counseling for multiple months because of scheduling constraints. (Docket Entry # 3, ¶¶ 14-15). On September 29, 2005, plaintiff emailed Chris Simmons ("Simmons"), PwC's then Chief Diversity Officer, raising general issues with PwC's assignment and retainment of black associates. (Docket Entry # 3, ¶ 17). Plaintiff also raised specific concerns regarding his own client assignments, decreased workload, removal from the Real Estate Group, lack of a formal coach and possible retaliation. (Docket Entry # 3, ¶ 17). From October 2005 through February 2006, plaintiff worked with the Affiliated Managers Group under Christopher Wigand ("Wigand"), a Caucasian associate hired the same year as plaintiff. (Docket Entry # 3, ¶ 18).

In May 2006, plaintiff accessed a PwC database that tracks the availability of its employees and observed a disproportionate number of African American associates were not working on client projects. (Docket Entry # 3, ¶ 19). Plaintiff brought this to the attention of Steve Anderman ("Anderman"), a Human Resources employee, and Tanya Sexton ("Sexton"), the Office Diversity Leader in PwC's Boston office. (Docket Entry # 3, ¶ 20). Subsequently, plaintiff met with Anderman and Sexton to discuss the underuse of African American associates. (Docket Entry # 3, ¶ 21). Plaintiff believed such underuse impeded professional development, caused emotional distress and encouraged African American associates to leave PwC. (Docket Entry # 3, ¶ 21).

Additionally, plaintiff voiced concerns over the lack of
promotions given to African Americans.  (Docket Entry # 3, ¶ 21).
On June 5, 2006, plaintiff again emailed Simmons to express the
need for a more equitable workplace.  (Docket Entry # 3, ¶ 22).

In August 2006, plaintiff worked on the Columbia Fund
project under Yasmin Clark ("Clark"), a Caucasian associate.
(Docket Entry # 3, ¶ 23).  Clark earned approximately $5,000 a
year more than plaintiff despite having only worked at PwC for a
few months.  (Docket Entry # 3, ¶ 24).  In September 2006,
plaintiff was assigned to the State Street Global Advisor
("SSGA") project in PwC's Princeton, New Jersey office under
Jennifer Marshall ("Marshall").  (Docket Entry # 3, ¶ 25).
Marshall, a Caucasian associate, was hired in the same year as
plaintiff.  (Docket Entry # 3, ¶ 25).  During his 2006 and 2007
work on the SSGA project plaintiff received positive evaluations.
(Docket Entry # 3, ¶ 29).  On August 29, 2007, plaintiff emailed
PwC's Ethics Department asking it to investigate the departure of
several African American employees.  (Docket Entry # 3, ¶ 26).
On September 12, 2007, plaintiff again emailed the Ethics
Department to raise concerns about harassing treatment he
received from two members of PwC's Portfolio Team.  (Docket Entry
# 3, ¶ 27).

In early 2008, plaintiff was reassigned to the SSGA project
in PwC's Boston office.  (Docket Entry # 3, ¶ 28).  On February
28, 2008, plaintiff initiated an internal complaint to PwC's

7

Ethics Department regarding condescending treatment he received from McEneaney, his SSGA Project Manager. (Docket Entry # 3, ¶ 30). On March 7, 2008, plaintiff emailed Lennon, the lead Partner on the SSGA project, to request a meeting on the matter. (Docket Entry # 3, ¶ 32). Lennon, however, replied she did not have time to meet that day. (Docket Entry # 3, ¶ 32). Four days later plaintiff spoke to Colleen Crawford ("Crawford"), PwC's Human Resources Manager, who advised plaintiff to attempt to speak with Lennon again. (Docket Entry # 3, ¶ 33). Crawford also advised plaintiff she would speak with Lennon and McEneaney. (Docket Entry # 3, ¶ 33).

During a March 18, 2008 meeting between plaintiff and Lau, another SSGA Project Manager, Lau explained that Lennon asked her to gather information regarding McEneaney's treatment of plaintiff. (Docket Entry # 3, ¶ 34). Lau, however, did not discuss McEneaney but rather questioned plaintiff about his work habits such as why he logged more hours on the SSGA project than other associates and why he did not work along side others in the SSGA team room. (Docket Entry # 3, ¶ 34). Plaintiff responded that his extra hours were devoted to helping less experienced associates and his absence from the team room was attributable to suffering from a cold. (Docket Entry # 3, ¶ 34). A week later plaintiff emailed Lennon to follow up on the McEneaney situation and to note that only one of 187 partners at PwC's Boston office was African American. (Docket Entry # 3, ¶ 35). Lennon replied

that she spoke with McEneaney. (Docket Entry # 3, ¶ 36).
Additionally, Lennon noted ongoing issues with assigning,
nurturing, promoting and retaining minorities at PwC. (Docket
Entry # 3, ¶ 36).

In April 2008, plaintiff received an invitation from Barry
Nearhos ("Nearhos"), PwC's Managing Partner for the Northeast, to
attend a PwC Boston Minority Staff event designed to "develop
stronger support for minority staff and to ensure better career
related experiences and opportunities." (Docket Entry # 3, ¶
41). Plaintiff replied to Nearhos's invitation, explaining that
without support from non-minority PwC personnel, PwC would be
unable to develop strong support for minority staff. (Docket
Entry # 3, ¶ 42). Nearhos sent a reply email to plaintiff and
Sexton, agreeing with plaintiff's assessment but explaining "we
need to walk before we run." (Docket Entry # 3, ¶ 43). Sexton
responded that she was working with plaintiff, Crawford and
Lennon on the issues despite having no prior discussions with
plaintiff. (Docket Entry # 3, ¶ 44).

On April 22, 2008, Lau emailed plaintiff asking him to
initiate his performance evaluation regarding his work on the
SSGA project. (Docket Entry # 3, ¶ 37). Lau also advised that
she and Christos Goutis ("Goutis") would be plaintiff's
reviewers. (Docket Entry # 3, ¶ 37). Plaintiff was hesitant
about Lau and Goutis conducting his evaluation because they had
not regularly reviewed most of his SSGA project work. (Docket

9

Entry # 3, ¶ 38). Consequently, plaintiff emailed Lennon to express his concerns. (Docket Entry # 3, ¶ 39). Lennon replied that Lau and Goutis could perform the review under new 2008 evaluation rules. (Docket Entry # 3, ¶ 40).

On May 13, 2008, plaintiff received his evaluation, which stated that his performance was sub-par and that he was late and at times failed to come to work. (Docket Entry # 3, ¶¶ 45-46). Plaintiff was upset with the evaluation because he received good performance reviews in 2006 and 2007 and because he had not been late nor failed to show for work. (Docket Entry # 3, ¶ 46). Plaintiff informed his manager Andrew Thorne ("Thorne"), Lennon and Sexton, among others, that he believed the poor evaluation was in retaliation for his February and March 2008 complaints to the Ethics Department. (Docket Entry # 3, ¶ 49). Subsequently, plaintiff requested a copy of his personal records but did not receive them until June 12, 2008, well outside the five business days required under section 52C of Massachusetts General Laws chapter 149. (Docket Entry # 3, ¶¶ 50-51). On May 20, 2008, plaintiff met with Crawford, his SSGA project Team Leader Peter Finnerty ("Finnerty") and Human Resources Leader Eric Pugh ("Pugh") to discuss the evaluation. (Docket Entry # 3, ¶ 52). During the meeting, plaintiff was told to take time off and asked if he needed help transitioning out of PwC. (Docket Entry # 3, ¶ 53).

On May 22, 2008, plaintiff submitted the administrative charge with the EEOC and MCAD.[2] (Docket Entry # 3, ¶ 55; Docket Entry # 6, Ex. 1). Under the section asking the party to indentify the discrimination, plaintiff checked the boxes next to "race," "color" and "retaliation." (Docket Entry # 6, Ex. 1, p. 1). Plaintiff identified the discrimination as occurring from February 28, 2008 to May 13, 2008, but did not identify the discrimination as a "continuing action." (Docket Entry # 6, Ex. 1, p. 1). Under the "particulars" section, plaintiff stated, "I believe that I have been retaliated against for having complained of race and color discrimination." (Docket Entry # 6, Ex. 1, p. 1). Plaintiff further stated:

> In 2006, I complained to . . . Anderman, who worked for Respondent's ethics department, that black employees who were available were not being assigned, resulting in them leaving the firm. On or about March 20, 2007, I complained to . . . Lennon . . . that it appeared that that [sic] was systematic discrimination in the office in regards to black employees. (My complaint was similar to that which had been made to . . . Anderman). She said she would talk to me and get others involved, but nothing transpired.

> On February 28, 2008, I called Respondent's Ethics Hotline and complained about my manager . . . McEneaney. I specifically stated that I was complaining because she treated me with disdain and a condescending attitude. I do not believe I mentioned race or color discrimination when I called the Ethics Hotline. On March 18, 2007, [sic] I was interrogated by . . . Lau . . . as a result of my complaints, and was told that she had been instructed to ask me questions.

---

[2] Plaintiff dated the administrative charge May 23, 2008. (Docket Entry # 6, Ex. 1, p. 1). The EEOC stamp, however, indicates receipt on May 22, 2008. (Docket Entry # 6, Ex. 1, p. 1).

> On May 13, 2008, I received a poor evaluation despite good
> performance. I believe the poor evaluation was in
> retaliation for my complaining to ethics about my manager's
> attitude, and because I raised concerns about possible
> discrimination. I therefore charge Respondent with
> discriminating against me because of my race/color (black)
> and with retaliating against me for having made complaints,
> in violation of Title VII . . . as amended, and the
> applicable laws of the Commonwealth of Massachusetts.

(Docket Entry # 6, Ex. 1, pp. 1-2).

Shortly after submitting the administrative charge,
plaintiff's PwC laptop crashed, requiring repair by the
Technology Group. (Docket Entry # 3, ¶ 56). When plaintiff
received the repaired laptop, he noticed the deletion of several
documents and evidence regarding PwC's discriminatory acts.
(Docket Entry # 3, ¶ 56). Plaintiff recalled a prior occasion in
which his laptop crashed but all of the files and data remained
intact when he received the repaired laptop. (Docket Entry # 3,
¶ 56). On August 8, 2008, plaintiff learned that he had not been
promoted. (Docket Entry # 3, ¶ 57). Promotions were not
something that PwC employees applied for but, rather, occurred
automatically after an employee's third year if he had
consistently received positive evaluations. (Docket Entry # 18,
Ex. 1, p. 2).

Plaintiff filed another administrative charge on May 7, 2009
("2009 charge").[3] (Docket Entry # 18, Ex. 1, p. 2). In the 2009
charge, plaintiff stated that he believed he "was denied a

---

[3] As noted above, the claims in the 2009 charge were
consolidated with those of the 2008 charge and the 2009 charge
was dismissed. (Docket Entry # 6, p. 4).

promotion in retaliation for filing a previous discrimination complaint against [PwC]." (Docket Entry # 18, Ex. 1, p. 2). On February 4, 2011, plaintiff received a letter from the EEOC notifying him that he had 90 days to commence action in federal court. (Docket Entry # 3, ¶ 58). In the amended complaint, plaintiff alleges:

> PwC's [sic] instituted polices and/or operational practices that discriminated against [p]laintiff and other associates of African descent, including, but are not limited to: not assigning him and other associates of African descent to clients [sic] project matters and other opportunities that afford a means for advancement; or leaving him and other associates of African descent working on non-client matters; giving associates of African descent less favorable assignments; promoting associates of African descent at rates disproportionately low compared to rates for others; and promoting associates of African descent at rates lower than their counterparts who are not of African descent.

(Docket Entry # 3, ¶ 61). Plaintiff further alleges that PwC "failed to perform a prompt, thorough and impartial investigation, and failed to address the discriminatory conduct." (Docket Entry # 3, ¶ 63). As a result, plaintiff alleges loss of earnings and emotional and mental distress. (Docket Entry, # 3, ¶¶ 64-65).


## DISCUSSION

### I. Count One: Racial Discrimination

PwC contends that Count One is subject to Rule 12(b)(6) dismissal because plaintiff failed to allege that unlawful discriminatory animus caused his harm. (Docket Entry # 6, p. 7).

13

Specifically, PwC argues that the administrative charge denied a connection between race discrimination and McEneaney's condescending treatment. (Docket Entry # 6, p. 7). Furthermore, PwC contends that Title VII and chapter 151B time bar earlier allegations of race discrimination because plaintiff failed to file a discrimination charge relating to those allegations within the 300 day requirement. (Docket Entry # 6, pp. 9-10). Before addressing whether plaintiff successfully pleads racial discrimination, this court examines which allegations are time barred under Title VII and chapter 151B.

A. Statute of Limitations

"Title VII and chapter 151B require plaintiffs to file claims with the EEOC and the MCAD before filing suit in court and within 300 days of complained acts of discrimination." Diaz v. Jiten Hotel Management, Inc., 762 F.Supp.2d 319, 327 (D.Mass. 2011); Alston v. Massachusetts, 661 F.Supp.2d 117, 123 (D.Mass. 2009) (the "plaintiff must file a Title VII or 151B claim within 300 days of the discriminatory act"); 42 U.S.C. § 2000e-5(e); Mass. Gen. L. ch. 151B, § 5. Title VII and chapter 151B, however, provide an equitable exception under the continuing violation doctrine. O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001); Cuddyer v. Stop & Shop Supermarket Co., 750 N.E.2d 928, 936-37 (Mass. 2001). The exception allows a plaintiff to recover for events occurring outside the 300 day limitations period if they are "part of an ongoing series of

14

discriminatory acts and there is 'some violation within the statute of limitations period that anchors the earlier claims.'" O'Rourke v. City of Providence, 235 F.3d at 730; Cuddyer v. Stop & Shop Supermarket Co., 750 N.E.2d at 936-37 (permitting the "plaintiffs to seek damages, if the alleged events are part of an ongoing pattern of discrimination, and there is a discrete violation within the six-month limitations period to anchor the earlier claims").

The analytical approach to the continuing violation doctrine requires two determinations: first, whether the subject matter of the discriminatory acts is sufficiently similar to establish a substantial relationship between the timely and untimely act; and second, whether the acts are isolated and discrete or occur frequently, repetitively or continuously. Brissette v. Franklin County, Sheriff's Office, 235 F.Supp.2d 63, 86-87 (D.Mass. 2003); see also National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113-115 (2002).[4] Acts that are part of an unlawful employment practice, i.e., those acts occurring frequently, repetitively or continuously, when considered individually may not rise to an

---

[4] Prior to National R.R. Passenger Corp. v. Morgan, federal courts distinguished between serial and systemic violations when addressing continuing violations claims. Brissette v. Franklin County, Sheriff's Office, 235 F.Supp.2d at 86; Cuddyer v. Stop & Shop Supermarket Co., 750 N.E.2d at 936 n.12 ("[f]ederal decisions distinguish between two types of continuing violations, 'serial' and 'systemic'"). After National R.R. Passenger Corp. v. Morgan, the First Circuit determined that such a distinction was "no longer necessary." Crowley v. L.L. Bean, Inc., 303 F.3d 387, 406 (1st Cir. 2002).

actionable claim.  National R.R. Passenger Corp. v. Morgan, 536 U.S. at 115.  Thus, the continuing violation doctrine allows an employee to base a suit "on the cumulative effect of individual acts."  Id.

"[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges," but may be used "as background evidence in support of a timely claim."  Id. at 113; accord Vesprini v. Shaw Contract Flooring Services, Inc., 315 F.3d 37, 41 n.4 (1st Cir. 2002); Ocean Spray Cranberries, Inc. v. Massachusetts Commission Against Discrimination, 808 N.E.2d 257, 268 (Mass. 2004) (permitting discrete acts under the continuing violation doctrine "would eviscerate the purpose of a statutory limitations period").  Examples of discrete acts include: "termination, failure to promote, denial of transfer, or refusal to hire."[5] National R.R. Passenger Corp. v. Morgan, 536 U.S. at 114.

1.  Timely Allegations

The administrative charge and the amended complaint contain allegations of racial discrimination that fall both within and

---

[5]  Other discrete acts extracted from National R.R. Passenger Corp. v. Morgan include: "wrongful suspension, wrongful discipline, denial of training, [and] wrongful accusation."  O'Connor v. City of Newark, 440 F.3d 125, 127 (3rd Cir. 2006).  Failure to assign duties may qualify as a discrete act or continuing violation depending on the circumstances.  See Brown v. Snow, 2003 WL 1907974, at *5 (S.D.N.Y. April 17, 2003) (requiring the plaintiff "to allege facts that would assist the Court in determining whether . . . the failure to assign . . . [was] a series of discrete acts or . . . a continuing violation")

outside of the 300 day limitations period. Plaintiff submitted the administrative charge on May 22, 2008, thereby dating the period to July 28, 2007.[6] (Docket Entry # 6, Ex. 1). The administrative charge identifies the discrimination period as February 28 to May 13, 2008. (Docket Entry # 6, Ex. 1, p. 1). During this time period, plaintiff alleges that McEneaney treated him with disdain and a condescending attitude. (Docket Entry # 6, Ex. 1, p. 1). Plaintiff also alleges that as a result of his complaints about McEneaney's treatment, Lau interrogated him and plaintiff thereafter received a poor evaluation. (Docket Entry # 6, Ex. 1, pp. 1-2). These allegations all fall within the 300 day limitations period.

The amended complaint contains similar timely allegations. On February 28, 2008, plaintiff alleges he initiated an internal complaint after McEneaney treated him with condescension. (Docket Entry # 3, ¶ 30). In a March 18, 2008 meeting between plaintiff and Lau, plaintiff states that Lau questioned him about his work habits. (Docket Entry # 3, ¶ 34). Subsequently, on May 13, 2008, plaintiff alleges he received a performance review indicating that his performance was sub-par and that he was late and at times failed to come to work. (Docket Entry # 3, ¶¶ 45-46).

---

[6] As noted above, plaintiff dated the administrative charge May 23, 2008, however, the EEOC stamp indicates receipt on May 22, 2008. (Docket Entry # 6, Ex. 1, p. 1).

Additionally, the amended complaint contains allegations of conduct not mentioned in the administrative charge, but timely nonetheless. In August and September 2007, plaintiff alleges he emailed the Ethics Department to initiate investigation of several African American employees' departures and to raise concerns about harassing treatment. (Docket Entry # 3, ¶¶ 26-27). On March 25, 2008, plaintiff alleges that he emailed Lennon, noting that only one of 187 partners at the Boston office was African American. (Docket Entry # 3, ¶ 35). Lennon allegedly replied three days later stating there were "ongoing issues with assigning, nurturing, promoting and retaining minorities at PwC." (Docket Entry # 3, ¶ 36). In April 2008, plaintiff alleges he received an invitation to attend a PwC Minority Staff event and after plaintiff voiced concerns about non-minority support, Nearhos responded, "we [PwC] need to walk before we run." (Docket Entry # 3, ¶¶ 41-43). Plaintiff also alleges that shortly after submitting the administrative charge his PwC laptop crashed and after the Technology Group repaired the laptop, several documents and evidence regarding PwC's discriminatory acts were deleted. (Docket Entry # 3, ¶ 56). Because these foregoing allegations relate to conduct occurring within the 300 day limitations period, Title VII and chapter 151B permit plaintiff to base his claims on that conduct unless prohibited on other grounds.

2. <u>Untimely Allegations and Continuing Violation Doctrine</u>

The administrative charge and amended complaint also include allegations of conduct occurring outside of the 300 day limitations period. In the administrative charge, plaintiff alleges that in 2006 he complained to Anderman that African American employees were not assigned work resulting in their leaving the firm. (Docket Entry # 6, Ex. 1, p. 1). Plaintiff also alleges he complained of systematic discrimination to Lennon on March 20, 2007. (Docket Entry # 6, Ex. 1, p. 1). Plaintiff, however, did not categorize the administrative charge as a "continuing action" and identified the dates of discrimination as occurring from February 28 to May 13, 2008. (Docket Entry # 6, Ex. 1, p. 1). These steps show that plaintiff differentiated between the untimely allegations as background evidence of racial discrimination and retaliation and the timely allegations as a basis for his claims of racial discrimination and retaliation.

In Count One, however, plaintiff claims:

> PwC's [sic] instituted polices and/or operational practices that discriminated against [p]laintiff and other associates of African descent, including, but are not limited to: not assigning him and other associates of African descent to clients [sic] project matters and other opportunities that afford a means for advancement; or leaving him and other associates of African descent working on non-client matters; giving associates of African descent less favorable assignments; promoting associates of African descent at rates disproportionately low compared to rates for others; and promoting associates of African descent at rates lower than their counterparts who are not of African descent.

(Docket Entry # 3, ¶ 61). These statements attempt to ground PwC's alleged racial discrimination to conduct outside of the

19

limitations period. For example, plaintiff alleges on September 29, 2005, he emailed Simmons to raise general issues regarding PwC's assignment and retainment of black associates.[7] (Docket Entry # 3, ¶ 17). Plaintiff also alleges that on multiple occasions he was assigned to work under Caucasian associates hired either the same year or after plaintiff. (Docket Entry # 3, ¶¶ 18, 23, 25). In May 2006, plaintiff allegedly accessed a PwC database that tracks the availability of its employees and observed a disproportionate number of African American associates unassigned to client projects. (Docket Entry # 3, ¶ 19). Plaintiff alleges he voiced concerns of the underuse of African American associates, the lack of promotions given to African American associates and the need for a more equitable workplace. (Docket Entry # 3, ¶¶ 21-22). These allegations ostensibly invoke the continuing violation exception to the 300 day limitations period because they relate to an ongoing unlawful employment policy. See National R.R. Passenger Corp. v. Morgan, 536 U.S. at 115 (unlawful employment practices "are based on the cumulative effect of individual acts" and are actionable under

---

[7] In the same email, plaintiff expressed specific concerns about his own client assignments, decreased workload, removal from the Real Estate Group, lack of a formal coach and possible retaliation. (Docket Entry # 3, ¶ 17). These allegations are time barred and not actionable under the continuing violation doctrine because the acts are discrete and therefore may only be used as background evidence. See National R.R. Passenger Corp. v. Morgan, 536 U.S. at 113; accord Vesprini v. Shaw Contract Flooring Services, Inc., 315 F.3d at 41 n.4; Ocean Spray Cranberries, Inc. v. Massachusetts Commission Against Discrimination, 808 N.E.2d at 268.

the continuing violation doctrine).

Under Title VII, however, an employee may not rely on the continuing violation doctrine to revive otherwise time barred claims if he had knowledge of the discriminatory conduct. Provencher v. CVS Pharmacy, Div. of Melville Corp., 145 F.3d 5, 14 (1st Cir. 1998), partially abrogated by Crowley v. L.L. Bean, Inc., 303 F.3d 387 (1st Cir. 2002); accord Cardarelli v. Massachusetts Bay Transportation Authority, 2010 WL 1416464, at *8 (D.Mass. April 7, 2010) (doctrine "does not apply when a plaintiff was aware that he 'was being unlawfully discriminated against while the earlier acts, now untimely, were taking place'"). Prior to July 28, 2007, plaintiff repeatedly voiced concerns regarding PwC's unfair treatment of African American associates thereby indicating knowledge of the unlawful employment practice.

In particular, a September 29, 2005 email from plaintiff to Simmons discussed issues with PwC assigning and retaining African American associates. (Docket Entry # 3, ¶ 17). In May 2006 plaintiff accessed a PwC database that indicated a disproportionate number of African American were not working on client projects. (Docket Entry # 3, ¶ 19). Subsequently, plaintiff met with Anderman and Sexton to discuss the underuse of and the lack of promotions given to African American associates. (Docket Entry # 3, ¶¶ 21-21). On June 5, 2006 and March 20, 2007, plaintiff expressed concerns about minority treatment and

complained about systematic discrimination. (Docket Entry # 3, ¶ 22; Docket Entry # 6, Ex. 1, p. 1). Accordingly, any unlawful employment practices taking place before July 28, 2007, are not actionable and may only be used as background evidence to support the actionable claims.[8] See National R.R. Passenger Corp. v. Morgan, 536 U.S. at 113; accord Vesprini v. Shaw Contract Flooring Services, Inc., 315 F.3d at 41 n.4; Ocean Spray Cranberries, Inc. v. Massachusetts Commission Against Discrimination, 808 N.E.2d at 268.

Massachusetts law provides a more generous limitations standard than federal law. Under chapter 151B, a plaintiff may litigate otherwise time barred claims regardless of awareness unless "delay in initiating the lawsuit, considered under an objective standard, was unreasonable." Cuddyer v. Stop & Shop Supermarket Co., 750 N.E.2d at 942; accord Clifton v. Massachusetts Bay Transportation Authority, 839 N.E.2d 314, 320 (Mass. 2005). Therefore, plaintiff's allegations regarding conduct prior to July 28, 2007, may be actionable under chapter 151B in the event a jury could conclude that the delay in initiating the suit was reasonable. See Cuddyer v. Stop & Shop Supermarket Co., 750 N.E.2d at 941 (deciding the continuing violation issue on a motion for summary judgment "based on what a jury might conclude from the facts"). Although the continuing

---

[8] As noted infra, the scope of investigation doctrine further limits the actionable period to those events taking place on or after February 28, 2008.

violation doctrine may revive the time barred claims under chapter 151B, the scope of investigation doctrine presents an additional hurdle to plaintiff.

3. <u>Scope of Investigation</u>

As noted above, Title VII and chapter 151B require plaintiff to file a charge with the EEOC and the MCAD before filing suit in court. <u>Diaz v. Jiten Hotel Management, Inc.</u>, 762 F.Supp.2d at 327; <u>Alston v. Massachusetts</u>, 661 F.Supp.2d at 123; 42 U.S.C. § 2000e-5(e); Mass. Gen. L. ch. 151B, § 5. The purpose behind the administrative charge is to provide the employer with notice and to create an opportunity for early conciliation. <u>Fantini v. Salem State College</u>, 557 F.3d at 26. Accordingly, "the scope of the civil complaint is . . . limited to the charge filed with the EEOC and the investigation which can reasonably be expected to grow out of that charge." <u>Id.</u> at 26-27 (internal quotation marks and brackets omitted).

In the administrative charge, plaintiff explicitly defines the period of discrimination from February 28 to May 13, 2008. (Docket Entry # 6, Ex. 1, p. 1). This period coincides with the specific dates outlined in plaintiff's allegations: McEneaney's condescending treatment on February 28, 2008, and plaintiff's poor evaluation on May 13, 2008.[9] (Docket Entry # 6, Ex. 1, pp.

_____

[9] The administrative charge does reference 2006 and early 2007 complaints about PwC's under utilization of African American associates and systematic discrimination. (Docket Entry # 6, Ex. 1, p. 1). These allegations provide background evidence of a discriminatory or retaliatory animus to the EEOC and MCAD but do

1-2). Furthermore, plaintiff failed to check the box next to "continuing action" in the administrative charge. (Docket Entry # 6, Ex. 1, p. 1). Accordingly, the scope of the investigation expected to grow out of the administrative charge is reasonably confined to the February 28, 2008 incident and its aftermath. The amended complaint's allegation that PwC "instituted policies and/or operational practices that discriminated against [p]laintiff and other associates of African descent" is actionable only to the extent that it relates to conduct occurring on or after February 28, 2008. Discriminatory acts occurring before February 28, 2008, are not separately actionable and may only be used as background evidence to support the timely and actionable claims.[10] See National R.R. Passenger Corp. v. Morgan, 536 U.S. at 113; accord Vesprini v. Shaw Contract Flooring Services, Inc., 315 F.3d at 41 n.4; Ocean Spray Cranberries, Inc. v. Massachusetts Commission Against Discrimination, 808 N.E.2d at 268.

B.  Adequate Allegations Supporting Racial Discrimination

In analyzing racial discrimination, the court uses the analytical framework outlined by the Supreme Court in McDonnell

_____

not expand plaintiff's well-defined discriminatory time frame.
    [10] Alternatively, plaintiff attempts to invoke the reasonable relation doctrine to expand the allegations on which he may rely. (Docket Entry # 15, p. 4); see also 804 Mass. Code Regs. § 1.10(6)(a). Reliance on this doctrine is unfounded because it requires "filing . . . an actual amendment to the administrative charge." Davis v. Lucent Technologies, Inc., 251 F.3d 227, 233 (1st Cir. 2001).

Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973), and Texas
Department of Community Affairs v. Burdine, 450 U.S. 248, 252-253
(1981) ("McDonnell Douglas test").  This framework governs both
state and federal discrimination claims.  See Douglas v. J.C.
Penney Company, Inc., 422 F.Supp.2d 260, 272 (D.Mass. 2006).
Under this framework, the plaintiff bears the initial burden of
establishing each element of his prima facie case.  McDonnell
Douglass Corp. v. Green, 411 U.S. at 802.

    If successful, this minimal showing functions to raise an
inference of discrimination.  Texas Department of Community
Affairs v. Burdine, 450 U.S. at 253.  The burden of production
then shifts "to the employer to articulate some legitimate,
nondiscriminatory reason" for the employment action.  McDonnell
Douglas Corp. V. Green, 411 U.S. at 802.  "If the employer
articulates such a reason, 'the McDonnell Douglas framework-with
its presumptions and burdens-is no longer relevant'" and "'the
sole remaining issue [is] discrimination vel non.'"  Velez v.
Thermo King de Puerto Rico, Inc., 585 F.3d 441, 447 (1ˢᵗ Cir.
2009).  The plaintiff carries the final burden of proving "that
the legitimate reasons offered by the [employer] were not its
true reasons, but were a pretext for discrimination."  Texas
Department of Community Affairs v. Burdine, 450 U.S. at 253; see
Thompson v. Coca-Cola Co., 522 F.3d 168, 177 (1ˢᵗ Cir. 2008) (the
plaintiff employee "must prove not only that the reason
articulated by the employer was a sham, but also that its true

reason was [the] plaintiff's race or national origin"); <u>Douglas v. J.C. Penney Co., Inc.</u>, 474 F.3d 10, 14 (1st Cir. 2007) (if "employer demonstrates such a reason, the burden returns to the employee to show that the proffered reason was mere pretext, and that the true reason was prohibited discrimination").[11]

1. <u>Prima Facie Showing</u>

To establish a prima facie case of racial discrimination, plaintiff must establish that: (1) he is a member of a protected class; (2) he was performing his job at an acceptable level; (3) he suffered an adverse employment action; and (4) his employer sought a replacement for him with roughly equivalent qualifications. <u>See</u> <u>Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc</u>, 399 F.3d 52, 58 (1st Cir. 2005); <u>Weber v. Community Teamwork, Inc.</u>, 752 N.E.2d 700, 711 (Mass. 2001); <u>Douglas v. J.C. Penney Company, Inc.</u>, 422 F.Supp.2d at 273; <u>Benoit v. Technical Mfg. Corp.</u>, 331 F.3d 166, 173 (1st Cir. 2003).

Plaintiff easily satisfies the first two requirements of a prima facie case. Plaintiff is an African American and thus a member of a protected class under both Title VII and chapter

---

[11] The state standard under chapter 151B is more favorable to plaintiff in the area of pretext and the ultimate showing of discriminatory intent. Succinctly stated, "[O]nce a plaintiff has established a prima facie case and further shows either that the employer's articulated reasons are a pretext or by direct evidence that the actual motivation was discrimination, the plaintiff is entitled to recovery for illegal discrimination under G.L. c. 151B." <u>Blare v. Husky Injection Molding Systems Boston, Inc.</u>, 646 N.E.2d 111, 117 (Mass. 1995).

151B.  See 42 U.S.C. § 2000e-2(a)(1); Mass. Gen. L. ch. 151B, §
4(1).  Additionally, plaintiff alleges that he received a poor
evaluation *despite good performance*.  (Docket Entry # 3, ¶ 49;
Docket Entry # 6, Ex. 1, pp. 1-2).  To support his claim of
acceptable performance, plaintiff alleges that during his 2006
and 2007 work on the SSGA project he received positive
evaluations.  (Docket Entry # 3, ¶ 29).  Plaintiff was "extremely
upset" with the May 13, 2008 evaluation because of his documented
positive evaluations and because the May 13, 2008 evaluation
contained inaccuracies regarding his attendance.  (Docket Entry #
3, ¶ 46).  Accordingly, the amended complaint contains sufficient
facts documenting plaintiff's acceptable job performance.

    Turning to the third requirement of a prima facie case, the
amended complaint sets forth the following adverse employment
actions:  (1) failure to assign plaintiff or other African
Americans to client projects and other opportunities affording
means for advancement; (2) assignment of African American
associates to less favorable tasks; and (3) failure to promote
plaintiff in August 2008 and disproportionately low promotion of
African American associates.  (Docket Entry # 3, ¶ 61).
Plaintiff may not rely on the first and second alleged adverse
employment actions because he offers no timely and actionable
allegations to support them.  The only references of PwC's
failure to assign in the administrative charge or amended

complaint are allegations of conduct in 2005 and 2006.[12] These
allegations fall well outside the 300 day limitations period and
the scope of the administrative charge.

Plaintiff does submit timely and actionable allegations
supporting the third adverse employment action. The amended
complaint alleges that as of March 2008 only one of 187 partners
in PwC's Boston office was African American. (Docket Entry # 3,
¶ 35). Additionally, plaintiff alleged that in August 2008 PwC
failed to promote him. (Docket Entry # 3, ¶ 57; Docket Entry #
18, Ex. 1, p. 2). The 2009 charge submits that the failure to
promote was based on *race discrimination* and retaliation.
(Docket Entry # 18, Ex. 1, p. 2). Plaintiff, however, must first
satisfy the four elements of a prima facie case for failure to
promote before it can qualify as an adverse employment action.

To establish a prima facie failure to promote claim,
plaintiff must show that he "(i) is a member of a protected class
who (ii) was qualified for an open position for which [he]
applied, but (iii) was rejected (iv) in favor of someone
possessing similar qualifications." Rathbun v. Autozone, Inc.,
361 F.3d 62, 71 (1st Cir. 2004). As noted above, plaintiff is an

---

[12]  Plaintiff voiced concerns of client assignment and
decreased workload in a September 29, 2005 email to Simmons.
(Docket Entry # 3, ¶ 17; Docket Entry # 6, Ex. 1, p. 1).  In May
2006, plaintiff accessed a PwC database that showed a
disproportionate number of African American associates were not
working on client assignments.  (Docket Entry # 3, ¶ 19).
Shortly thereafter, plaintiff met with Anderman and Sexton to
discuss the client assignment issue.  (Docket Entry # 3, ¶ 21).

African American. (Docket Entry # 3, ¶¶ 1, 60). Plaintiff
alleges that he was qualified for the promotion, basing the
qualifications on earlier positive evaluations and the
inaccuracies in the May 13, 2008 evaluation. (Docket Entry # 3,
¶¶ 29, 46). Plaintiff alleges in the 2009 charge that employees
did not apply for promotions. (Docket Entry # 18, Ex. 1, p. 2).
Rather, promotions occurred automatically after the employee's
third year if he had consistently received positive evaluations.
(Docket Entry # 18, Ex. 1, p. 2). Additionally, plaintiff
alleges that he did not receive the promotion. (Docket Entry #
3, ¶ 57).

The final element establishing a prima facie case of racial
discrimination is identical to the final element required to
establish failure to hire as an adverse employment action. See
Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc, 399 F.3d
52 at 58 (the plaintiff must show that "(4) [his] employer sought
someone of roughly equivalent qualifications to perform
substantially the same work); Rathbun v. Autozone, Inc., 361 F.3d
62 at 71 (the plaintiff must show that he was rejected "in favor
of someone possessing similar qualifications"). Thus, the
analysis on these elements may be combined. Plaintiff submits
that a "list of employees . . . had been promoted." (Docket
Entry # 3, ¶ 57). Although this allegation does not assert that
the employees were similarly qualified, plaintiff has provided
background evidence allowing this inference. For example,

29

plaintiff alleges that African American associates either did not receive promotions or received them one or more years after their Caucasian counterparts. (Docket Entry # 3, ¶¶ 21, 27). Plaintiff also presents specific examples including his consistent assignment to Caucasian associates hired the same year or after plaintiff and the allegation that only one of 187 partners in PwC's Boston office was African American. (Docket Entry # 3, ¶¶ 18, 23-25, 35).

Combining this background evidence with his timely allegation, plaintiff makes a prima facie showing that PwC passed him over for the promotion with a similarly qualified associate. Therefore, plaintiff establishes that the failure to promote was an adverse employment action. Furthermore, plaintiff satisfies the final prima facie element demonstrating racial discrimination. Accordingly, plaintiff pleads significant facts to establish that PwC discriminated against plaintiff based on his race.

## 2. Discriminatory Animus

PwC argues that plaintiff failed to allege racial discrimination because plaintiff did not allege PwC acted with discriminatory animus. (Docket Entry # 6, p. 7). PwC submits that the administrative charge expressly denied a connection between race discrimination and the condescending treatment. (Docket Entry # 6, p. 7). PwC's assertions fail for three reasons. First, PwC mischaracterizes the administrative charge

and the amended complaint. Plaintiff did not deny that racial
discrimination played a role. Rather, he stated he did "not
believe [he] mentioned race or color discrimination when [he]
called the Ethics Hotline." (Docket Entry # 6, Ex. 1, p. 1).
Additionally, the final paragraph of the administrative charge
states plaintiff's belief that "the poor evaluation was in
retaliation for my complaining to ethics about my manager's
attitude, *and because I raised concerns about possible
discrimination*." (Docket Entry # 6, Ex. 1, p. 1) (emphasis
added).

Second, as noted above the scope of investigation doctrine
permits a complaint to expand to "the investigation which can
reasonably be expected to grow out of [the administrative]
charge," Fantini v. Salem State College, 557 F.3d at 27, even if
plaintiff did not mention race discrimination to the Ethics
Hotline. Plaintiff checked the boxes next to "race" and "color"
thereby providing PwC with notice that he was alleging racial
discrimination. (Docket Entry # 6, Ex. 1, p. 1). Furthermore,
plaintiff identified instances of racial discrimination in the
administrative charge, including the 2006 and 2007 complaints
about systematic discrimination surrounding PwC's failure to
assign African American employees. (Docket Entry # 6, Ex. 1, p.
1). Although, plaintiff limited the scope of the administrative
charge to discrimination taking place on or after February 28,
2008 (Docket Entry # 6, Ex. 1, p. 1), PwC could reasonably expect

31

that the EEOC and MCAD would investigate charges of racial discrimination.

Third, plaintiff does not bear the responsibility of showing discriminatory animus where PwC fails "to articulate some legitimate, nondiscriminatory reason" for the employment action. McDonnell Douglas Corp. V. Green, 411 U.S. at 802. As discussed above, plaintiff satisfied his initial burden of establishing a prima facie case of racial discrimination. He only carries the final burden of proving "that the legitimate reasons offered by [PwC] were not its true reasons, but were a pretext for discrimination," Texas Department of Community Affairs v. Burdine, 450 U.S. at 253, if PwC establishes a non-discriminatory basis for its conduct. PwC, however, overlooks this duty and fails to offer legitimate justifications for its conduct. Therefore, Rule 12(b)(6) dismissal of Count One is inappropriate.

## II. Count Two: Retaliation

PwC contends that Count Two is subject to Rule 12(b)(6) dismissal because plaintiff fails to show that the poor evaluation and failure to promote were retaliation for plaintiff's complaint of racial discrimination. (Docket Entry # 6, p. 7). In order to establish a prima facie retaliation claim under Title VII, the plaintiff must show that: (1) he engaged in protected conduct; (2) he suffered some adverse employment action; and (3) "the two were causally linked." Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005); Navarro v. U.S.

Tsubaki, Inc., 577 F.Supp.2d 487, 500 (D.Mass. 2008).[13] The "plaintiff needs to prove that protected conduct and an adverse employment action are causally linked." Douglas v. J.C. Penney Co., Inc., 474 F.3d at 15.

Plaintiff alleges retaliation in response to his internal complaints and to his filing the administrative charge of racial discrimination. (Docket Entry # 3, ¶ 49; Docket Entry # 6, Ex. 1, p. 1-2; Docket Entry # 18, Ex. 1, p. 2). Asserting the right to be free from racial discrimination at work is a protected activity under both Title VII and chapter 151B. 42 U.S.C. § 2000e-3(a); Mass. Gen. L. ch. 151B, § 4. Internal complaints as well as charges to the EEOC and MCAD are protected activity. White v. New Hampshire Department of Corrections, 221 F.3d 254, 262 (1st Cir. 2000) ("[t]he plaintiff engaged in protected activity by filing her internal and EEOC complaints"); Mullenix v. Forsyth Dental Infirmary for Children, 965 F.Supp. 120, 149 (D.Mass. 1996) ("without question . . . filing a complaint with the MCAD and the EEOC . . . comprise[s] protected activity"); accord Bonds v. School Commission of Boston, 956 N.E.2d 800 (Mass.App.Ct. 2011) ("MCAD filing [is] a protected activity" as well as "certain internal complaints"). Accordingly, the administrative charge to the EEOC and MCAD is protected activity.

---

[13] Like Title VII, chapter 151B contains a similar retaliation prohibition. Billings v. Town of Grafton, 515 F.3d 39, 52 n.12 (1st Cir. 2008); Mass. Gen. L. ch. 151B, § 4(4A).

PwC submits that plaintiff's internal complaints of McEneaney's condescending treatment do not qualify as protected activity because plaintiff expressly stated the treatment was not racially motivated. (Docket Entry # 6, p. 8). As discussed above, PwC mischaracterizes the administrative charge and the amended complaint. Although initially plaintiff stated he did "not believe [he] mentioned race or color discrimination" when he complained of McEneaney's treatment, he went on to allege that the retaliation was in response to his complaints "about [his] manager's attitude, and because [he] *raised concerns about possible discrimination*." (Docket Entry # 6, Ex. 1, pp. 1-2) (emphasis added).

Additionally, after initiating the internal complaint, plaintiff twice emailed Lennon to encourage her to discuss the matter with McEneaney. (Docket Entry # 3, ¶¶ 32, 35). In the second email, plaintiff noted that only one of 187 partners at the Boston office was African American. (Docket Entry # 3, ¶¶ 35). After speaking with McEneaney, Lennon responded to plaintiff that there remained "ongoing issues with assigning, nurturing, promoting, and retaining minorities" at PwC. (Docket Entry # 3, ¶ 36). Such a statement demonstrates that Lennon understood plaintiff's complaints to be racially based. Consequently, plaintiff's internal complaint to the Ethics Department and his subsequent statements to Lennon qualify as protected activity.

Under the second prima facie requirement, plaintiff alleges to have suffered adverse employment actions, namely a sub-par performance evaluation and lack of promotion. (Docket Entry # 3, ¶¶ 45-46, 57; Docket Entry # 6, Ex. 1, p. 2). For an adverse employment action to be present, "typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities . . . or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service." Blackie v. State of Maine, 75 F.3d 716, 725 (1st Cir. 1996); accord Martin v. Stericycle, Inc., 389 F.Supp.2d 131, 134 (D.Mass. 2005). "[R]efusals to promote" and "unwarranted negative job evaluations" may rise to adverse employment action depending on objective, case-by-case inquiry. Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 23 (1st Cir. 2002); accord Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 37 (1st Cir. 2011); King v. City of Boston, 883 N.E.2d 316, 324 (Mass.App.Ct. 2008) ("[d]etermining whether an action is materially adverse necessarily requires a case-by-case inquiry . . . cast in objective terms").

A negative evaluation by itself does not qualify as an adverse employment action. Sweeney v. West, 149 F.3d 550, 556 (7th Cir. 1998) ("negative performance evaluations, standing

alone, cannot constitute an adverse employment action"); Hall v. FMR Corp., 667 F.Supp.2d 185, 200 (D.Mass. 2009) (employee showed "no evidence that the evaluation was in fact unwarranted or that she suffered any adverse employment action as a result"). Instead, an employee must connect the evaluation to some other detriment he experienced such as a decrease, or lack of increase, in compensation. See Dickinson v. UMass Memorial Medical Group, 2011 WL 1155497, *13 (D.Mass. March 24, 2011) ("'needs improvement' performance review [was] an adverse employment action" where employee alleged he received a 2.5% pay raise instead of 4%); Hall v. FMR Corp., 667 F.Supp.2d at 200 (failure to show negative evaluation had any "negative impact on [employee's] bonus or compensation"). Plaintiff alleged that PwC failed to promote him in August 2008 approximately three months after his sub-par evaluation. (Docket Entry # 3, ¶¶ 45, 57). Furthermore, the 2009 charge stated that the promotion was automatic if the employee had consistently received positive evaluations. (Docket Entry # 18, Ex. 1, p. 2). Therefore, plaintiff establishes that the evaluation had a negative impact on his employment. As noted above, plaintiff also establishes that the failure to promote qualifies as an adverse employment action.

Under the third prima facie requirement, a plaintiff must first show the defendant's knowledge of the protected activity to demonstrate a causal connection between the protected activity

and the adverse employment action. Navarro v. U.S. Tsubaki,
Inc., 577 F.Supp.2d at 500-01 ("If the defendant did not know
that the plaintiff undertook conduct that was protected, then any
subsequent adverse employment action cannot be linked to the
protected conduct."). Plaintiff alleges that he contacted Lennon
on March 7, 2008, to instruct Lennon to discuss with McEneaney
her condescending treatment. (Docket Entry # 3, ¶ 32). Lau met
with plaintiff approximately 11 days later to discuss McEneaney's
treatment of plaintiff. (Docket Entry # 3, ¶ 34). This meeting
demonstrates that Lau had knowledge of plaintiff's complaint of
McEneaney's treatment. Lau was partially responsible for
plaintiff's performance review (Docket Entry # 3, ¶ 38) thus
connecting plaintiff's complaint, i.e., his protected activity,
to the sub-par evaluation, i.e., the subsequent adverse
employment action. Furthermore, the EEOC notifies an employer of
a charge within ten days of its filing, 42 U.S.C. § 2000e-5(b),
thus establishing PwC's knowledge of plaintiff's administrative
charge.

Plaintiff further connects the protected activity to the
adverse employment action by demonstrating their temporal
proximity. See Wyatt v. City of Boston, 35 F.3d 13, 16 (1st Cir.
1994) (one way to show "causation is by establishing that the
employer's knowledge of the protected activity was close in time
to the employer's adverse action"); accord Che v. Massachusetts
Bay Transportation Authority, 342 F.3d 31, 38 (1st Cir. 2003)

("[t]emporal proximity is . . . one method of proving retaliation"). Plaintiff alleges that he received his poor performance evaluation within two and a half months of complaining about McEneaney's condescending treatment. (Docket Entry # 3, ¶¶ 30, 45-46). Additionally, plaintiff alleges that within three months of filing his administrative charge with the EEOC and MCAD he received notice that PwC had not promoted him. (Docket Entry # 3, ¶¶ 55, 57). Such temporal proximity creates a prima facie showing that PwC retaliated against plaintiff for engaging in protected activity. Accordingly, Rule 12(b)(6) dismissal of Count Two is inappropriate.


## CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[14] that the motion to dismiss the amended complaint (Docket Entry # 5) be **ALLOWED** as to individual defendants Lennon, McEneaney and Lau and **DENIED** as to PwC.


/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[14] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. See Rule 72(b), Fed. R. Civ. P. Any party may respond to another party's objections within 14 days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order.